OPINION
{¶ 1} Appellants, James T. Flaherty and Jacqueline Adams, appeal from the judgment entered by the Lake County Court of Common Pleas, Probate Division, holding them guilty of indirect civil contempt of court and failing to purge the same. For the reasons discussed in this opinion, we affirm. *Page 2 
 {¶ 2} On April 10, 1995, appellant Adams was appointed guardian of the person and estate of her mother, Bertina Hards. In the course of her guardianship of the estate, Adams filed six partial accountings of the guardianship estate's assets. In the final partial accounting, filed September 13, 2001, Adams reported the estate assets at $220,350.40.
 {¶ 3} On March 15, 2001, the Lake County Probate Court appointed appellee Richard T. Spotz, Jr., Esq., as special master commissioner to resolve various matters which had arose pertaining to, inter alia, the payment of attorneys fees relating to litigation in which the estate had been involved. Attorney Spotz filed a report which was adopted by the probate court in its February 4, 2002 judgment entry. In this order, the trial court resolved the pending requests for attorney fees and other matters; the court also removed Adams as guardian of the Hards' estate but retained her as guardian of Hards' person. The court further appointed Attorney Russell J. Meraglio, Jr. successor guardian for the Hards estate. As a result, the court ordered Adams to "file a final and distributive account" and "turn over all Estate Documentation to *** Meralgio *** within 30 days" of the judgment. Moreover, the court ordered Mr. Meraglio to "file the appropriate bond" with the court "within 10 days of the final and Distributive Account being filed ***." Adams did not appeal this judgment.
 {¶ 4} On February 24, 2002, Bertina Hards died at her home in Geauga County. Adams was subsequently appointed the Administratrix of the decedent's estate which was processed through the Geauga County Probate Court.
 {¶ 5} On March 15, 2002, the probate court awarded special master commissioner Spotz $11,855 for services and expenses to be paid by the guardian of *Page 3 
the Hards estate. Adams appealed the award and, in August of 2003, this court reversed and remanded the matter for the limited purpose of determining whether the amount was reasonable. See In re Guardianship ofHards, 11th Dist. No. 2002-L-54, 2003-Ohio-4224. On October 3, 2003, a hearing on remand was held. At the hearing, Adams was represented by appellant Flaherty and Attorney Geoffrey Weaver. No objections were raised challenging Spotz's fees and, in any event, Flaherty maintained that Adams did not have standing to question the fees. Flaherty acknowledged that "in fact and in law, Mr. Meraglio is the guardian of the Hards estate" and Adams rights and duties as guardian of the person terminated upon the death of the decedent.
 {¶ 6} In its October 7, 2003 judgment entry, the probate court awarded Spotz fees in the amount of $13,709.76 taxed as costs to the estate pursuant to R.C. 2101.07. The court also emphasized that, as of the judgment, none of the estate assets had been delivered to Meraglio. The court subsequently scheduled a hearing to determine the status of the $220,350.40, which was listed as estate assets in Adams' sixth partial accounting. The court again ordered Adams to "return all guardianship funds to the guardianship" and ordered Flaherty to "file a written explanation with the Court *** concerning what happened to the guardianship funds and who has possession of said funds." The court underscored it desired an explanation from Flaherty of the status of the undelivered funds, not an accounting. In lieu of an explanation, Flaherty advised Adams to file a "Summary of Inventory and Accounts," the majority of which were accounts already on file in the probate court.
 {¶ 7} On October 24, 2003, the probate court issued a judgment entry finding that neither Adams nor Flaherty had complied with its October 7 order. In this *Page 4 
judgment, the court acknowledged Adams had filed a "Summary of Inventory and Accounts" in which, for the first time, she identified Bertina Hards' assets as "joint with a right of survivorship" and "payable on death" assets. This document failed to account for guardianship assets or establish "what assets in the guardianship, if any, were joint assets or had a beneficiary prior to the establishment of the guardianship." The court again ordered Adams and Flaherty to comply with the mandates of its October 7, 2003 judgment.
 {¶ 8} On November 26, 2003, in response to a motion for instructions filed by Adams, the probate court issued another judgment entry Adams and Flaherty to comply with its October 7 and 24, 2003 judgment entries. The court additionally advised Adams that it could not accept the final distributive account until court costs had been paid.
 {¶ 9} On December 5, 2003, in response to various motions and documents filed by Flaherty, the probate court issued another judgment ordering Adams and Flaherty to file an explanation regarding the locus of the unaccounted-for $220,000 in the guardianship estate. On January 9, 2004, Adams filed numerous documents relating to the decedent's probate estate in Geauga County and her status as Administratrix. Included in these documents was a report of newly-discovered assets consisting of $78,000 in funds located in various credit union accounts.
 {¶ 10} In its January 16, 2004 judgment entry, the probate court again ordered Adams and Flaherty to "turn over all original documents relating to the ownership of the assets of the guardianship of Bertina Hards to *** Meraglio *** for attorney Meraglio to review and make copies of any documents he deems necessary." The court noted that, *Page 5 
although Adams had submitted a purported "final and distributive account," the account would not be approved "because it is not an accurate accounting, there is no proof that the bond *** is current and court costs have not been paid." The court ordered Meraglio and Spotz to make request for additional fees within 20 days of the judgment entry. Thereafter, Spotz filed two applications for special master commissioner fees in the amount of $18,110.13, and Meraglio filed an application for guardian fees in the amount of $5,959.
 {¶ 11} In February 2004, Flaherty filed a notice of appeal from the probate court's October 7, 2003 judgment entry. In September 2004, this court dismissed the appeal as untimely. In re Hards, 11th Dist. No. 2004-L-028, 2004-Ohio-4866, at ¶ 9.
 {¶ 12} In November 2004, Adams filed a writ of prohibition in this court seeking to prevent the probate court from proceeding with this matter asserting the probate court lost jurisdiction over the guardianship estate upon the death of the ward. State ex rel. Estate ofHards v. Klammer, 11th Dist. No. 2004-L-189, 2005-Ohio-2655. This court subsequently dismissed Adams' petition, holding "the jurisdiction of a `guardianship' court does not completely terminate immediately after the ward's death. Instead, that court has continuing jurisdiction to settle all pending matters in the action and render a judgment as to the final accounting of the estate." Id. at ¶ 20. This court's decision was upheld by the Supreme Court of Ohio in State ex rel. Estate of Hards v.Klammer, 110 Ohio St.3d 104, 2006-Ohio-3670.
 {¶ 13} On February 23, 2006, the probate court held a hearing on the following matters: the payment of the special master and guardian fees; the status of guardianship accounts and assets; the payment of court costs; the filing of a final *Page 6 
account; and motions to show cause for Adams' and Flaherty's failure to comply with the court's previous orders of February 4, 2002, October 7, 2003, October 24, 2003, November 26, 2003, and January 16, 2004.
 {¶ 14} In a judgment entry, dated June 23, 2006, the probate court found that Adams and Flaherty failed to show cause for their failure to comply with the court's previous orders and repeated the orders for them to pay court costs including Spotz's and Meraglio's fees, file a final distributive account, deliver guardianship assets to Meraglio, and provide Meraglio with guardianship documentation. The court advised Adams and Flaherty they would be subject to contempt if they failed to timely comply with the court's orders. A hearing on Spotz's and Meraglio's fee requests was continued due to Adams' and Flaherty's allegations that they were not served with motions for the fees. Adams appealed the court's June 23, 2006 decision to this court under appellate number 2006-L-158. This appeal was initially dismissed for failure to prosecute, but subsequently reinstated upon Adams' motion.
 {¶ 15} On September 19, 2006, Spotz and Meraglio filed separate motions to show cause against Adams and Flaherty, setting forth charges of civil and criminal contempt. On October 13, 2006, the probate court entered orders to show cause against Adams and Flaherty, requiring them to appear and show cause as to why they should not be held in civil and/or criminal contempt for their repeated failure to comply with multiple prior court orders. The court additionally ordered the cases referred to the Lake County Prosecuting Attorney for prosecution of criminal contempt charges.
 {¶ 16} On December 1, 2006, the Lake County Prosecutor filed a bill of particulars stating seven counts of indirect criminal contempt against Flaherty and nine *Page 7 
counts of indirect criminal contempt against Adams. On December 4, 2006, Adams paid court costs, including special master commissioner fees in the amount of $17,603.02. The charges of indirect criminal contempt went to trial on December 5, 2006. On January 5, 2007, the probate court found Adams and Flaherty guilty on all counts of criminal contempt with the exception of the contempt for failure to pay. A subsequent hearing was held relating to the charge of civil contempt. After the hearing, both appellants were found guilty of indirect civil contempt. Both Adams and Flaherty appealed the probate court's judgment holding them in indirect criminal contempt. In In re Guardianship of Hards,175 Ohio App.3d 168, 2008-Ohio-630, this court affirmed the judgment of the probate court.
 {¶ 17} While that appeal was pending, on June 21, 2007, the probate court commenced a hearing on whether appellants had purged its order finding them in indirect civil contempt and on appellees' motion to award attorney fees stemming directly from appellants' contemptuous conduct. On August 14, 2007, the trial court determined that although appellants had from January 5, 2007 until June 21, 2007 to purge the contempt finding, they had failed to do so. As a result, Flaherty was fined $500 and sentenced to jail "until he complies with the order of [the probate] Court to explain what happened to the assets of the guardianship." Adams was also fined $500 and sentenced to jail until she (a) "[t]urn[ed] over all assets of the guardianship, regardless of whether joint assets or assets owned solely by the ward, to Russell J. Meraglio, Jr., Esq., guardian of the estate;" (b) "[t]urn[ed] over to Russell J. Meraglio, Jr., Esq., guardian of the estate, documentation of all guardianship assets to prove the ownership of the assets from the inception of the guardianship ***;" and (c) filed "a *Page 8 
proper final and distributive account, accounting for the guardianship assets from the end date of the sixth partial account ***." Adams and Flaherty were also ordered to pay (1) $23,250 in attorney fees, plus $266.25 in costs to Mr. Meraglio and (2) $39,400 in attorney fees, plus $1,016.27 in costs to Mr. Spotz, all incurred "as a direct result of the contemnors' actions."
 {¶ 18} Appellants filed this timely appeal and assign six errors for our review. As their first, second, and third assignments of error are related, we shall address them together. They provide, respectively:
 {¶ 19} "[1.] The trial court erred as a matter of law, to the prejudice of appellant Adams when it found her in indirect civil contempt of court, notwithstanding the fact that appellant Adams had either already complied with the trial court's order where it was in her power to do so, or where total compliance with the orders of the court was impossible of performance [sic] and would have required her to disobey Ohio law breaching her fiduciary duties.
 {¶ 20} "[2.] The trial court erred as a matter of law, to the prejudice of appellant Flaherty when it found him in civil contempt, notwithstanding the fact that appellant Flaherty had either already complied with the trial court's order where it was in his power to do so, or where total compliance with the orders of the court was impossible [sic] of performance and would have required him to disobey Ohio law breaching his fiduciary duties.
 {¶ 21} "[3.] The court erred to the prejudice of appellants Adams and Flaherty when it made a finding that neither had properly purged the civil contempt. It is an error of law and an abuse of the trial court's discretion to find appellants failed to purge any *Page 9 
contempt, if contempt was proven at all, because it would have been impossible for them to do so without disobeying Ohio law and breaching fiduciary duties."
 {¶ 22} The primary purpose of a contempt proceeding is to vindicate the authority and proper functioning of the court. See Denovchek v. Bd.of Trumbull Cty. Commrs. (1988), 36 Ohio St.3d 14, 15. Great reliance should be placed upon the trial court's discretion in holding a party in contempt. Id., see, also, State ex rel. Ventrone v. Birkel (1981),65 Ohio St.2d 10, 11. Thus, a reviewing court will not upset a trial court's conclusion on this issue unless its decision is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 23} Contempt is generally understood as a disregard for judicial authority. Lough v. Lough, 5th Dist. No. 98CA00120, 1999 Ohio App. LEXIS 5272, *26, citing, State v. Flinn (1982), 7 Ohio App.3d 294. Contempt may be either direct or indirect. In re Purola (1991),73 Ohio App.3d 306, 310. Direct contempt involves actions occurring in the presence of the court, while indirect contempt occurs outside its immediate presence. Id. Furthermore, contempt proceedings may be either criminal or civil in nature. Criminal and civil contempt serve different purposes in the judicial system and are governed by different rules.Lough, supra, at *27. Civil contempt is pursued for the benefit of a complainant and is therefore remedial in nature. Purola, supra at 311. Alternatively, criminal contempt is usually characterized by unconditional fines or prison sentences. Id. One charged and found guilty of civil contempt must be allowed to purge him/herself of the contempt by showing compliance with the court's order he/she is charged with violating. Id. at 312. However, in the case of criminal contempt, there is *Page 10 
no requirement that the individual charged be given the opportunity to purge the contempt.
 {¶ 24} In the instant matter, appellants were charged with and found guilty of indirect civil contempt.[1] R.C. 2705.02 governs indirect contempt, and provides, in relevant part:
 {¶ 25} "A person guilty of any of the following acts may be punished as for contempt:
 {¶ 26} "(A) Disobedience of, or resistance to, a lawful writ, process, order, rule, judgment, or command of a court or [an] officer."
 {¶ 27} As indicated by the foregoing statute, a necessary precondition for a charge of contempt for disobeying a court is the existence of a valid court order. See Cortland United Methodist Church v. Knowles, 11th Dist. No. 2006-T-0110, 2007-Ohio-3383, at ¶ 33.
 {¶ 28} The evidence submitted at trial and during the purge hearing revealed the probate court had, on at least seven separate occasions, formally ordered Adams to file a final distributive accounting relating to the guardianship and turn over all estate documentation to Mr. Meraglio.[2] Furthermore, on at least five separate occasions, Mr. Flaherty was ordered to file a written explanation concerning who, if anyone, was in possession of over $220,000 of unaccounted-for guardianship funds.[3] As a result of appellants' mutual acts or omissions, Attorney Meraglio was unable to file a final *Page 11 
account on and/or wind up the guardianship estate of Bertina Hards. Attorney Meraglio testified, "had there been a compliance with the court order four years ago [i.e., the February 4, 2002 order], this [matter] would have been done and we wouldn't have to be here." Attorney Meraglio, as guardian, and Attorney Spotz, as the special commissioner, were regularly haled into court and continued to incur additional expenses as a direct result of the conduct which led to the filing of the indirect civil contempt proceedings against appellants.
 {¶ 29} At the civil contempt hearing, testimony from various witnesses, including that of Adams and Flaherty, indicated Adams had not transferred or delivered the guardianship assets to Meraglio nor had she filed a final accounting. Instead of complying with the court's February 4, 2002 order, Adams testified she transferred the guardianship assets in her possession to the Geauga County Probate Court after the death of the ward pursuant to Flaherty's advice. Adams testified, despite numerous rulings and orders to the contrary, she did not recognize Mr. Meraglio as the guardian of the estate. Further, when questioned about the missing $220,000, Adams was notably evasive. She first stated the funds were joint and survivorship assets which passed to her upon the death of her mother. However, regardless of the account's legal designation, Adams was unable to explain where the funds went. She ambiguously testified the money "all went to part of the care of [her] mother" and, while she could not provide corroborating documentation of how or where the money was spent, she repeatedly assured the court that everything was "tracked."
 {¶ 30} Adams also testified that once she transferred the assets to the Geauga County Probate Court, she could not remove them to satisfy the various Lake County *Page 12 
orders; however, Adams admittedly sought and received permission from the Geauga Probate Court to pay fees and expenses related to the Lake County guardianship proceedings. After being questioned on this inconsistency, she noncommittally asserted she had "talked" to the Geauga Probate Court about transferring the assets but was unaware of its decision and made no effort to discover if any decision was rendered. Irrespective of her inability to provide any credible explanation regarding the missing money and recognition of her failure to comply with the numerous orders, Adams nevertheless advised the court she "felt" she addressed everything appropriately.
 {¶ 31} At the purge hearing, Adams stated she was aware that the civil contempt could be lifted if she simply turned over the assets to Mr. Meraglio for a final accounting. She admitted she made no attempt to comply with the court's order because she still felt Mr. Meraglio was not the guardian. When questioned whether she had even sought permission from the Geauga County Probate Court to temporarily transfer the assets to Lake County to wind up the guardianship, she did not directly respond. Instead, Adams simply stated if she had made the request, proof could be found "in the Geauga court record." When pressed on this issue, Adams stated she did not recall whether she moved the Geauga County Probate Court for the transfer, but again assured the court that the answer to the question could be found in the Geauga record. Adams admittedly failed to obtain a copy of the Geauga record for the purge hearing.
 {¶ 32} At the hearings, Mr. Flaherty's testimony substantially echoed that of Ms. Adams. He defended his position that Mr. Meraglio could not be the guardian by asserting his belief that Meraglio had failed to properly accept the appointment. He *Page 13 
further argued, regardless of the failure of acceptance, the guardianship ceased to exist when the ward died, a position which had been summarily rejected by this court as well as the Supreme Court of Ohio. The evidence submitted at each hearing revealed that Mr. Flaherty has still failed to explain the status of or account for the guardianship assets as required by the trial court's October 7, October 24, November 26, and December 6, 2003, and June 23, 2006 judgment entries.
 {¶ 33} In light of the foregoing testimony, the lower court concluded appellants did not purge the indirect civil contempt order.
 {¶ 34} Appellants still argue they ignored the various court orders because Meraglio was not a validly appointed guardian and, in any event, the guardianship ceased to exist upon the death of the ward. With respect to the former argument, nothing in the record indicates Meraglio refused to accept the court's February 4, 2002 appointment or was subsequently removed from this position. To the contrary, Mr. Meraglio testified he has been the guardian since the 2002 appointment and would remain so until he completed his duties "winding up" the guardianship estate. Even if there were a technical problem relating to Meraglio's appointment, appellants did not file a direct appeal of the February 4, 2002 judgment entry appointing Attorney Meraglio successor guardian. Hence, any argument relating to the sufficiency of the appointment process is barred by the doctrine of res judicata.
 {¶ 35} Further, although both Adams and Flaherty have consistently maintained the Lake County Probate Court lacked subject matter jurisdiction over the matter upon the death of the ward, this court and the Supreme Court of Ohio have previously rejected this position. SeeState ex rel. Estate of Hards v. Klammer, 11th Dist. *Page 14 
No. 2004-L-189, 2005-Ohio-2655; State ex rel. Estate of Hards v.Klammer, 110 Ohio St.3d 104, 2006-Ohio-3670; In re Guardianship ofHards, 175 Ohio App.3d 168, 2008-Ohio-630, at ¶ 49. Clearly, the probate court possessed jurisdiction over the subject matter as well as the parties. This is the law of the case as well as a common principle governing the law of guardianship. The probate court therefore had jurisdiction to proceed with winding up the estate, i.e., requiring Adams and Flaherty to file a final accounting and turn over estate assets to the successor guardian along with anything else necessary to facilitate the process. Appellants' arguments to the contrary have no merit.
 {¶ 36} Adams and Flaherty additionally argue they were prevented from following the dictates of the various orders of the Lake County Probate Court due to impossibility. "Impossibility of performance is a valid affirmative defense to a contempt charge." Bertolone v. Bertolone, 11th Dist. No. 2001-L-001, 2001-Ohio-8733, 2001 Ohio App. LEXIS 5656, *3. Impossibility of performance occurs where an unforeseen event arises rendering a party's performance of an obligation impossible. See, e.g.,Skilton v. Perry Local School Dist. Bd. of Edu., 11th Dist. No. 2001-L-140, 2002-Ohio-6702, at ¶ 26. "The performance must be rendered impossible without fault of the party asserting the defense and where the difficulties could not have been reasonably foreseen." Id. A party who raises the defense of impossibility of performance has the burden of proving the same. Bertalone, supra.
 {¶ 37} Here, the record reveals that Flaherty advised Adams to transfer the assets at issue to the Geauga County Probate Court upon death of the ward. Adams followed this advice, in spite of the outstanding February 4, 2002 judgment entry ordering her to file a final distributive accounting of the guardianship estate and turn *Page 15 
over all estate documentation to the successor guardian, Mr. Meraglio. These facts demonstrate appellants' performance was not precluded by impossibility.
 {¶ 38} Appellants were capable of complying with the Lake County order at the time it was issued. Instead of doing so, they created the situation they allege rendered their performance impossible. The difficulties arising from appellants' voluntary act of surrendering the assets to the Geauga Probate Court without complying with the Lake County judgment entry could have been reasonably foreseen. As appellants were at fault and could have reasonably anticipated the ensuing problems issuing from their actions, they are precluded from asserting the defense of impossibility of performance.[4]
 {¶ 39} The record is clear that Adams and Flaherty were aware the requirements of the various court orders relating to their obligations vis-À-vis winding up Bertina Hards' guardianship estate. However, both parties, through their actions and testimony, demonstrated an unwillingness to comply with the unambiguous pronouncements of the Lake County Probate Court. Throughout the entirety of the civil contempt and purge hearings, Adams was elusive and noncommittal regarding her actions and/or justifications for acting. Her testimony on crucial issues was equivocal and dodgy leading this court to conclude her aim was to obfuscate the truth-finding process and avoid any responsibility for her admitted acts and/or omissions. Moreover, Flaherty was equally, if not more evasive. He haughtily argued with the court regarding the validity of its (as well as another superior court's) legal conclusions. He was disruptive and defiant *Page 16 
throughout the proceedings standing firm in his position that the Lake County Probate Court had no authority to compel his compliance with its numerous orders.
 {¶ 40} The testimony and evidence submitted at the hearings demonstrated both Adams and Flaherty consciously and systematically defied the many existing court orders. Although their defiance was based upon Flaherty's subjective legal theory that all matters and orders relating to the guardianship were void upon the death of the ward, this theory was tested and rejected on various appeals. Even after Flaherty's jurisdictional argument was rejected, there was no evidence either Adams or Flaherty attempted to formally petition the Geauga County Probate Court to have the assets removed from the estate for purposes of winding up the Lake County guardianship. Because Adams and Flaherty have, time and again, disobeyed, resisted, and/or failed to comply with the probate court's lawful orders, the probate court did not abuse its discretion in finding them guilty of indirect civil contempt of court.
 {¶ 41} Furthermore, Adams and Flaherty failed to purge the contempt order after being given the opportunity.[5] Appellants had over six months to accomplish the purge but made no bona fide attempts to do so. Instead, they preferred to remain faithful to their oft-rejected position that the guardianship had automatically and absolutely terminated upon the death of the ward.
 {¶ 42} As appellants were properly found guilty of indirect civil contempt and subsequently failed to purge the same, their first, second, and third assignments of error lack merit. *Page 17 
 {¶ 43} As their fourth, fifth, and sixth assignments of error deal with jurisdictional challenges, we shall address them together. They read:
 {¶ 44} "[4.] The trial court erred to the prejudice of appellants when it ruled as a matter of law that due to the Ohio Supreme Court's decision in State ex rel. Estate of Hards v. Klammer (110 Ohio ST. 3rd 104) [sic] that it could exercise unlimited jurisdiction and that same was not subject to review.
 {¶ 45} "[5.] The trial court erred to the prejudice of appellants when it abused its discretion acting outside its judicial boundaries. By dismissing the writ of prohibition the Ohio Supreme Court determined that the Lake County Probate Court did, indeed, have jurisdiction in this matter absent a patent, unambiguous showing lack of jurisdiction which is the ONLY issue the Ohio Supreme Court addressed concerning the writ of prohibition — not whether the trial court abused its discretion in the exercise of that jurisdiction." [Emphasis sic]
 {¶ 46} "[6.] The trial court erred to the prejudice of defendant[s]-appellants when it abused its discretion and succumbed to jurisdictional excess."
 {¶ 47} Under these assignments of error, appellants assert that although a probate court has jurisdiction to "wind up" a guardianship estate after the death of the ward, this jurisdiction does not include (1) "order[ing] the fiduciary and estate counsel to commit a series of impossible, if not illegal acts;" (2) "order[ing] [a]ppellant Adams or appellant Flaherty to transfer the remaining Guardianship assets to a legal stranger and remove the same from the [d]ecedent's [e]state as mandated by law;" (3) "award[ing] fees to attorneys for their own services for their own benefit which occurred over a period of two to five years after the death of the [w]ard;" (4) "usurp[ing] or encroach[ing] *Page 18 
on the exclusive [j]urisdiction of the Geauga County Probate Court[;]" and (5) succumbing to "jurisdictional excess" by ordering appellant Flaherty to pay costs in violation of his due process rights.
 {¶ 48} First of all, the probate court did not draw the conclusion that it possessed unlimited jurisdiction, as appellants' fourth assignment of error asserts. Rather, the court stated:
 {¶ 49} "*** attorney Flaherty has continued to argue that the Probate Court has no jurisdiction, even after the Ohio Supreme Court ruled on that very issue in an appeal from the denial of a Writ of Prohibition filed in the Eleventh District Court of Appeals. Attorney Flaherty refuses to acknowledge the law of the case doctrine, which is a "rule of judicial hierarchy" whereby "the decision of a reviewing court in a case remains the law of the case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." [Keytack v. City of Warren, 11th Dist. No. 2005-T-0152,2006-Ohio-5179, ¶ 56]. *** [T]he Ohio Supreme Court, in this very case, rejected [Flaherty's jurisdictional arguments], stating `even after the wards [sic] death, "those power[s] and duties necessarily involved in the proper accounting and settlement of the [guardianship] continue."' [State ex rel. Estate of Hards v. Klammer, 110 Ohio St.3d 104,2006-Ohio-3670, at ¶ 13]. The jurisdictional arguments are res judicata." Probate Court Judgment Entry, August 14, 2007, p. 17-18.
 {¶ 50} The trial court's judgment unequivocally reflects that its jurisdiction over the guardianship estate extends to the proper and final settlement of the guardianship accounts and any other matters related to the process of "winding up" the estate. This ruling is neither new nor unique to this case. The probate court, this court, and the *Page 19 
Supreme Court have all drawn the same conclusion. Because the jurisdictional matter was settled by superior reviewing courts, it is the law of the case and is binding in all subsequent proceedings.
 {¶ 51} Despite appellants' insistence that their "enlightened" interpretation of the law supersedes the rulings of this court and the Supreme Court of Ohio, we hold, once again, the probate court has jurisdiction over guardianship matters, even after the death of the ward, to conduct a proper accounting and settlement of the estate. The contempt proceedings were therefore properly conducted to compel appellants to comply with prior orders necessary for winding up the guardianship estate of Bertina Hards in Lake County.
 {¶ 52} With respect to the other issues raised under appellants' fourth assignment of error, we have already determined appellants were not precluded by impossibility from complying with the probate court's order. However, we point out, even if the defense of impossibility of performance were viable, it would not function to bar the court's jurisdiction.
 {¶ 53} Next, appellants argue the probate court's order to transfer the assets of the guardianship and all documentation relating thereto to the successor guardian is not a component of "winding up" the estate and therefore the court did not have jurisdiction to enforce the same. To the contrary, the transfer, which has been the subject of multiple orders since 2002, is fundamental and necessary to winding up the estate. Insofar as appellants have refused or resisted the transfers ordered, the estate cannot be wound up. In fact, had appellants obeyed the orders and not engaged in the obstructionist tactics which led to the underlying findings of civil and criminal contempt, *Page 20 
the estate would have likely been settled years ago. However, until the assets and documentation are released to the successor guardian, the probate court cannot wind up the guardianship and the case cannot be closed.
 {¶ 54} Appellants next argue that the probate court's award of attorney fees was not an aspect of winding up the case. Appellants are correct; however, their statement is irrelevant. The award of fees was a function of appellants' contemptuous conduct. While the contemptuous conduct arose from appellants' refusal to abide by multiple court orders relating to the transfer of assets and documentation to the successor guardian (i.e., matters critical to winding up the estate), the contempt hearings were separate from the process of winding up the guardianship estate.
 {¶ 55} The contempt proceedings were commenced to compel compliance with court orders issued to facilitate winding up the guardianship estate. "In a civil contempt action, a trial court may award attorney fees as compensation for losses which occurred as a direct result of the contempt." Whitman v. Monastra, 8th Dist. No. 76633, 2000 Ohio App. LEXIS 4637, *16, citing Brown v. Executive 200, Inc. (1980),64 Ohio St.2d 250, 254. Because the fees at issue were awarded in the context of the indirect civil contempt proceedings, the trial court properly exercised jurisdiction over this issue.
 {¶ 56} In relation to this issue, appellants argue the trial court abused its discretion in awarding the fees at issue. We disagree. Awards of attorney fees or sanctions as costs are permitted if those fees have a clear nexus with the contemnors' behavior. See, e.g., State ex rel.Fraternal Order of Police, Captain John C. Post Lodge No. 44 v.Dayton (1977), 49 Ohio St.2d 219, 229-230, Sup. R. 71(H) provides: "There shall be no minimum or maximum fees that automatically will be approved by the *Page 21 
Court." Further, "[a]ttorney fees in all matters are governed by Rule 1.5 of the Ohio Rules of Professional Conduct." Sup. R. 71(A). That rule provides factors that must be considered in determining the reasonableness of fees:
 {¶ 57} "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
 {¶ 58} "(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
 {¶ 59} "(3) the fee customarily charged in the locality for similar legal services;
 {¶ 60} "(4) the amount involved and the results obtained;
 {¶ 61} "(5) the time limitations imposed by the client or by the circumstances;
 {¶ 62} "(6) the nature and length of the professional relationship with the client;
 {¶ 63} "(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
 {¶ 64} "(8) whether the fee is fixed or contingent."
 {¶ 65} An attorney seeking fees has the burden of introducing sufficient evidence of his or her services and the reasonable value thereof. In re Verbeck's Estate (1962), 173 Ohio St. 557,559. A court's decision to award fees will not be reversed absent an abuse of discretion. State ex rel. Sawyer v. Cendroski, 118 Ohio St.3d 50,52,2008-Ohio-1771.
 {¶ 66} Here, Attorney Meraglio submitted a fee bill for services rendered from February 6, 2002 through June 21, 2007, which broke down his services relative to the open guardianship estate and the proceedings that followed from appellants' failure to abide by the probate courts' multiple orders. Attorney Meraglio sought fees which *Page 22 
totaled $34,016.55. After considering the relevant Rule 1.5 factors, as well as whether the fees charged were related to Attorney Meraglio's services as successor guardian or whether they address fees incurred due to appellants' disobedience of the probate court's orders, the court concluded that $600 in fees should be awarded to Meraglio in his capacity as successor guardian which would be taxed to the guardianship estate. It further concluded that Meraglio was entitled to $23,250 in attorney fees and $266.55 in costs as a direct result of appellants' contemptuous conduct. The court's determination was neither arbitrary nor unreasonable.
 {¶ 67} Attorney Spotz submitted a bill which totaled $60,188.27. The bill was broken down into three parts: Fees and costs directly resulting from appellants' contemptuous behavior, fees incurred as a natural and probable consequence of appellants' contemptuous behavior, and fees which would not have been incurred but for appellants' contemptuous behavior. After considering the relevant Rule 1.5 factors, the court determined that Attorney Spotz incurred attorney fees and expenses directly resulting from appellant's actions in the amount of $39,500 and costs in the amount of $1,016.27. The probate court's conclusion was based upon a careful reasoned analysis of the bills presented. The court therefore did not abuse its discretion in awarding attorney fees and costs to Attorney Meraglio and Attorney Spotz.
 {¶ 68} Next, as indicated above, appellants are wrong in their assertion that the Lake County Probate Court, in attempting to properly settle the guardianship estate, encroached upon the exclusive jurisdiction of the Geauga County Probate Court. The court has continuing jurisdiction to wind up the guardianship estate and does not *Page 23 
exceed its jurisdictional boundaries in attempting to enforce its previous, lawful orders towards the end of accomplishing a final settlement of the estate.
 {¶ 69} Finally, appellants assert the trial court violated appellant Flaherty's right to due process by assessing costs against him. Appellants essentially claim that Flaherty's rights were compromised because he was not on notice of the proceedings and not afforded an opportunity to be heard. We disagree.
 {¶ 70} The trial court properly exercised its jurisdiction over the contempt proceedings. As discussed ad nauseam, the underlying proceedings were a function of appellants' refusal to follow court orders of which they both were aware. Appellants had notice of each of the orders and defied them based upon their mistaken belief the Lake County Probate Court did not have jurisdiction. Contempt proceedings were eventually filed against both appellants. At all relevant proceedings both appellants made appearances and were given the opportunity to be heard. In light of the foregoing procedural sequence, we can discern no violation of appellant Flaherty's due process rights.
 {¶ 71} Appellants' fourth, fifth, and sixth assignments of error lack merit.
 {¶ 72} For the reasons discussed in this opinion, appellants' six assignments of error are overruled. Therefore, the judgment of the Lake County Court of Common Pleas, Probate Division, is affirmed.
MARY JANE TRAPP, P.J., concurs,
COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.
[1] Appellants were also found guilty of criminal contempt which was previously affirmed by this court in a separate appeal. See In ReGuardianship of Hards, 175 Ohio App.3d 168, 2008-Ohio-630.
[2] These orders were dated February 4, 2002; October 7, 2003; October 23, 2003; November 26, 2003; December 6, 2003; January 16, 2004; and June 23, 2006. The specific nature of these orders is discussed in greater detail in the factual recitation above.
[3] On October 7, 2003, October 23, 2003, November 26, 2003, December 6, 2003, and June 23, 2006, the court issued these orders.
[4] Moreover, even if Adams could not be held technically responsible for the events leading to their claim of impossibility (because she acted on Attorney Flaherty's advice), the record indicates they did not seek leave of the Geauga County Probate Court to remove the assets for the limited purpose of complying with the existing Lake County order. By failing to formally move the Geauga County Probate Court in this fashion, they did not exhaust all possible avenues. In other words, purging their contempt was still a possibility at the time of the hearing and therefore impossibility of performance was not a viable defense to appellants' inaction.
[5] In relation to this issue Adams alleges that she tried but was unsuccessful in filing a final accounting because the probate court would not accept it. However, pursuant to the probate court's January 16, 2004 judgment entry, the final accounting Adams refers to was incomplete, inaccurate, and therefore unacceptable. *Page 24